FILED
APR 14 2021
U. S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 4:21CR254 HEA/NCC |
| ) | |
| JACKSON PRESTON SIPLES III, ) | |
| Defendant. ) | |

## INDICTMENT

The Grand Jury charges that:

## BACKGROUND

1. At all times relevant to this indictment, defendant Jackson Preston Siples III ("the Defendant") was a resident of Cape Girardeau County, Missouri. Since in or about 2017, the Defendant has been an employee of or an owner of several durable medical equipment ("DME") companies, including AE Wellness, Integrity Medical Supply, and Radiance Health Group. DME includes, but is not limited, to orthotic braces, canes, crutches, walkers, wheelchairs, and hospital beds.

2. At all times relevant to this indictment, co-schemer Brandy McKay was a resident of Cape Girardeau County, Missouri. After receiving EMT training, McKay worked in the health care field in various capacities, including as a medical assistant at the Ferguson Medical Group in Sikeston, Missouri, in the dialysis unit at St. Francis Hospital in Cape Girardeau, Missouri, and as an office manager at Jackson Healing Arts from 2009 until 2015. Since 2015, McKay has owned or managed at least ten companies that sold DME to patients, including AE Wellness,

1

MC Medical Supply, Integrity Medical Supply, and McKay Management Co.

3.   At all times relevant to this indictment, co-schemer Jamie McCoy ("McCoy") was a resident of Cape Girardeau County, Missouri. From in or about 2013 to at least 2019, McCoy was employed in the health care field. Since in or about 2015, he has owned or operated several DME companies, including AE Wellness, LLC, Summit Medical Supply, Patriot Medical Supply, and DME Device Co.

4.   At all times relevant to this indictment, the Defendant, McCoy, and McKay owned or operated companies that provided orthotic braces and other DME to patients and submitted, or caused to be submitted, reimbursement claims to Medicare, Medicaid, Tricare, and other health care benefit programs for DME.

## Relevant Medicare Provisions

5.   The United States Department of Health and Human Services, through the Centers for Medicare and Medicaid Services ("CMS"), administers the Medicare Program, which is a federal health care benefits program for the elderly and disabled. Medicare Part B reimburses health care providers for covered health services that they provide to Medicare beneficiaries in outpatient settings. Medicare Part B reimburses providers for DME that is medically necessary and ordered by a medical doctor or other qualified Medicare provider.

6.   The Medicare Advantage Program, known as Medicare Part C, offers beneficiaries a managed care option by allowing individuals to enroll in private health plans rather than having their care covered through Medicare Part A or Part B. CMS contracts with Medicare Advantage programs to provide medically necessary health services to beneficiaries; in return, CMS makes monthly payments for enrolled beneficiaries to the Medicare Advantage

2

programs.

7.    CMS acts through fiscal agents called Medicare Administrative Contractors or "MACs" which are statutory agents for CMS for Medicare Part B. The MACs are private entities that review claims and make payments to providers for services rendered to Medicare beneficiaries. The MACs are responsible for processing Medicare claims arising within their assigned geographic areas, including determining whether the claim is for a covered service.

8.    To receive Medicare reimbursement, providers must make an appropriate application to the MAC and execute a written provider agreement. The provider agreement obligates the provider to know, understand, and follow all Medicare regulations and rules. After successful completion of the application process, the MAC assigns the provider a unique provider number, which is a necessary identifier for billing purposes.

9.    Medicare providers must retain clinical records for the period required by state law or five years from the date of discharge if there is no requirement in state law.

**Enrollment in Medicare**

10.   Between December 2015 and December 2018, the Defendant, McKay, and McCoy completed and signed several Medicare enrollment applications. Contained in the enrollment applications was Section 13, entitled "Penalties for Falsifying Information" which informed the applicant that he or she could be criminally prosecuted for (a) executing or attempting to execute a health care fraud scheme or using false or fraudulent statements or representations to obtain money from a health care benefit program; or (b) making or using false or fraudulent statements or representations in connection with the delivery or payment for health care benefits, items, or services.

3

11. On or about November 13, 2017, the Defendant completed a Medicare provider enrollment application for Integrity Medical, which application contained Section 13, "Penalties for Falsifying Information," and Section 15, "Certification Statement," The Defendant signed the "Certification Statement" of the applications and thereby certified:

> I have read and understand the Penalties for Falsifying Information, as printed in the application. I understand that any deliberate omission, misrepresentation, or falsification of any information . . . contained in any communication supplying information to Medicare . . . [may be criminally prosecuted].
>
> I agree to abide by the Medicare laws, regulations and program instructions . . . including the Federal anti-kickback statute . . .
>
> I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

12. On or about December 6, 2018, the Defendant completed a Medicare provider enrollment application for Radiance Health Group and identified himself as the owner, manager, and director of Radiance Health Group. The provider enrollment application contained the same Section 13, "Penalties for Falsifying Information," and Section 15, "Certification Statement," described above. Thus, the Defendant received notice on at least two occasions of the penalties for providing false information to Medicare and certified that he would comply with the laws, regulations, and policies applicable to Medicare.

13. As part of the Medicare provider enrollment application for AE Wellness and Patriot Medical Supplies, on or about December 12, 2015, December 12, 2016, January 11, 2017, and May 31, 2017, co-schemer McCoy signed the "Certification Statement" of the applications. These Medicare provider enrollment applications contained the same Section 13,

4

"Penalties for Falsifying Information," and Section 15, "Certification Statement," described above. Thus, McCoy received notice on multiple occasions of the penalties for providing false information to Medicare and repeatedly certified that he would comply with the laws, regulations, and policies applicable to Medicare.

14.  Between November 13, 2017 and March 2, 2018, co-schemer McKay completed several Medicare provider enrollment applications, including one on or about November 13, 2017, for MC Medical Supply. These Medicare provider enrollment applications contained the same Section 13, "Penalties for Falsifying Information," and Section 15, "Certification Statement," described above. Thus, McKay received notice on multiple occasions of the penalties for providing false information to Medicare and repeatedly certified that she would comply with the laws, regulations, and policies applicable to Medicare.

## Relevant Missouri Medicaid Provisions

15.  MO HealthNet administers the Missouri Medicaid Program, which is jointly funded by the State of Missouri and the federal government. Missouri Medicaid reimburses health care providers for covered services rendered to eligible low-income Medicaid recipients.

16.  A Medicaid provider must enter into a written agreement with MO HealthNet to receive reimbursement for medical services to Medicaid recipients and must agree to abide by MO HealthNet regulations in rendering and billing for those services.

17.  On or about April 19, 2018, as the "owner/CEO," co-schemer McKay signed a Missouri Medicaid provider agreement containing the following language:

> By my signature below, I, the applying provider, read and agree that, upon the acceptance of my enrollment, I will participate in the Vendor Payment plan. I am responsible for all services provided and all billing done under my provider

5

number regardless to whom the reimbursement is paid. It is my legal responsibility to ensure that the proper billing code is used and indicate the length of time I actually spend providing services regardless to whom the reimbursement is paid. I agree to be financially responsible for all services, which are not documented. I agree the Missouri Title XIX Medicaid manual, bulletins, rules, regulations and amendments thereto shall govern and control my delivery of services and further agree to the following terms:

>   I agree that it is my responsibility to access manual materials that are available from DMS over the Internet. I will comply with the Medicaid manual, bulletins, rules, and regulations as required by the Division of Medical Services and the United State Department of Health and Human Services in the delivery of services and merchandise and in submitting claims for payment. I understand that in my field of participation I am not entitled to Medicaid reimbursement if I fail to so comply, and that I can be terminated from the program for failure to comply.

18.     Medicaid providers must retain, for five years from the date of service, fiscal and medical records that reflect and fully document services billed to Medicaid and must furnish or make the records available for inspection or audit by the Missouri Department of Social Services or its representative upon request. Failure to furnish, reveal, or retain adequate documentation for services billed to the Medicaid Program may result in recovery of the payments for those services not adequately documented and may result in sanctions to the provider's participation in the Medicaid Program. This policy continues to apply in the event of the provider's discontinuance as an actively participating Medicaid provider through the change of ownership or any other circumstance.

### **Relevant Tricare Provisions**

19.     Tricare is a federally funded program that reimburses for health care services provided to active, retired, reserve, guard, and uniformed service members and their families. The Defense Health Agency ("DHA") is a joint, integrated agency that supports the delivery of health services to military health system beneficiaries. DHA exercises management

6

responsibility for Tricare and receives, processes, and pays claims on behalf of Tricare.

## Relevant Telemedicine Requirements

20. Telemedicine, also referred to as telehealth medicine, is the use of information technology by doctors and other authorized health care providers to provide clinical health care from a distance. Telemedicine includes, but is not limited to, real-time audio or video communication between patients in one location and the doctor or authorized health care provider in another location. In all instances, telemedicine doctors or other authorized health care providers are required to conduct an evaluation and assessment sufficient to determine the patients' medical needs before prescribing or ordering any service or product, including DME equipment, genetic testing, and medications.

## Federal Anti-Kickback Statute

21. Compliance with the Anti-Kickback Statute Act (42 U.S.C. § 1320a-7b(b)) ("AKS") is a condition of payment for both Medicare and Medicaid. In other words, Medicare and Medicaid will not pay for services that are provided in violation of the AKS.

22. The AKS makes it a criminal offense for any person to knowingly and willfully solicit, offer, pay or receive remuneration in return for or to induce any person to refer, recommend, furnish, or arrange for the furnishing of any items, goods, and services, paid in whole or in part by any federally funded health care program. Both parties to such an arrangement may be criminally liable if one purpose of the arrangement is to obtain remuneration for the referral of services or to induce referrals.

23. Remuneration is broadly defined as anything of value, including money, goods, services, or the release or forgiveness of a financial obligation that the other party would

7

normally have to pay. In passing the AKS, Congress intended to prohibit financial incentives that could affect the medical judgment of those providing or referring patients for health care services.

### Counts 1-6
### Health Care Fraud Scheme
### 18 U.S.C. §§ 1347(a)(1) and 2

24. Paragraphs 1 to 23 are incorporated by reference as if fully set out herein.

25. It was part of the scheme and artifice to defraud that the Defendant, McKay, and McCoy incorporated and operated the businesses, identified below, and used these businesses as vehicles to commit the criminal offenses described below.

**AE Wellness**

26. On or about January 19, 2015, McCoy incorporated AE Wellness, a DME company doing business as Summit Medical Supply, and listed himself as the organizer and registered agent. On or about August 30, 2016, AE Wellness became a Medicare provider.

27. In or about February 2017, co-schemer McKay began working for AE Wellness as the office manager and compliance officer. She was responsible for billing for AE Wellness and Patriot Medical Supplies, dealing with patient complaints, and handling Medicare audits.

28. From about April 2017 to late 2017, the Defendant managed the day-to-day operations at AE Wellness. His duties included, among others, receiving orders for DME, arranging for the DME to be shipped to patients' homes, and payment for the orders and DME.

29. While employed at AE Wellness, the Defendant, McKay, and McCoy received Medicare compliance training, which included training on the federal Anti-Kickback Statute. They were informed and therefore knew it was illegal to solicit, offer, pay, or receive kickback

8

payments in exchange for referring patients, items, or services which were to be reimbursed by Medicare or Medicaid.

30. It was part of the scheme and artifice to defraud that co-schemer McCoy contracted with marketing firms to identify patients for AE Wellness and paid the marketing companies for each referral sent to AE Wellness. The marketing companies ran television and online ads offering orthotic braces, at no cost, to the patients. When a patient responded to the ad, an employee of the call center collected pertinent information, including the patient's name and address, name of the patient's primary care physician, insurance information, Medicare number, and areas of pain.

31. It was part of the scheme and artifice to defraud that the marketing company then sent the patient information to a telemedicine doctor, who ordered the DME equipment. The telemedicine doctor had no prior doctor-patient relationship with the patients, did not directly communicate with the patients in most cases, and did not evaluate or assess the patients' need for the DME and other items. The order signed by the telemedicine doctor, called a "lead" or a "full lead," was then electronically transmitted to a marketing company, which sold the leads to DME companies.

32. It was part of the scheme and artifice to defraud that while the fraud scheme was ongoing, McCoy used several individuals and marketing companies to generate leads and frequently changed companies because of the large number of patient complaints that AE Wellness received. Patients or the patient representatives routinely complained that they had not requested and did not need or want the orthotic braces.

33. One of the individuals from whom McCoy bought leads was A.W. who at times sent AE Wellness 100 to 300 leads per week. McCoy and A.W. agreed that A.W. would receive 70-80% of the AE Wellness profits in return for A.W. sending leads and paying for orthotic braces and the costs associated with shipping the braces to patients.

34. It was also part of the scheme and artifice to defraud that co-schemer McCoy had an agreement with R.F. to buy both "raw" and "full" leads from R&L Senior Marketing ("R&L"), which was owned by R.F. McCoy paid R&L about $35 to $40 for each "raw lead," which was a lead that did not include a doctor's order and paid R&L about $280 to $300 for a "full lead," which was a lead that included a doctor's order. McCoy paid R&L about $10,000 to $15,000 per month for leads.

35. It was part of the scheme and artifice to defraud that from about September 2016 until about August 2017, the Defendant, McKay, and McCoy submitted or caused AE Wellness to submit reimbursement claims, totaling $6,028,505, to Medicare for the DME provided to patients based on the leads. The Defendant, McKay, and McCoy knew Medicare would not pay for items or services obtained by illegal kickbacks.

36. On or about July 28, 2017, the Defendant received and signed for a letter from AdvanceMed, a Medicare contractor, suspending AE Wellness' participation in the Medicare Program. In the letter, AdvanceMed stated that AE Wellness was suspended by Medicare because it had paid illegal kickbacks to doctors in exchange for sending orders for orthotic braces to AE Wellness and had billed the Medicare Program for medically unnecessary services when there was no prior relationship between the ordering physician and the patients.

37. The Defendant, McCoy, and McKay were all aware of the Medicare suspension letter and knew the reasons Medicare suspended AE Wellness. To circumvent the Medicare suspension, the Defendant, McKay, and McCoy decided to open new DME companies and to conceal McCoy's involvement in the new DME companies. Per their agreement, McKay opened MC Medical and the Defendant opened Integrity Medical Supply.

**MC Medical Supply**

38. It was part of the scheme and artifice to defraud that on or about August 2017, one month after AE Wellness's suspension, co-schemers McKay and McCoy agreed that McKay would open her own DME business, to be called MC Medical Supply ("MC Medical") and located in Cape Girardeau, Missouri. McKay invested $13,000 and McCoy loaned McKay an additional $20,000 to start MC Medical. McKay and McCoy agreed that McCoy would be paid $100,000 annually for his assistance and they would split MC Medical profits "50/50."

39. It was part of the scheme and artifice to defraud that McKay completed the Medicare provider enrollment application for MC Medical on or about November 13, 2017 and again on March 2, 2018 and listed herself as the sole owner. McKay intentionally concealed McCoy's involvement in MC Medical, despite being advised in the enrollment application that she could be prosecuted for submitting false information in the Medicare application. McKay feared that Medicare would not approve the application if McCoy was involved, because his company, AE Wellness, had just been suspended months before and AE Wellness still had not repaid Medicare for the payments received based on the earlier fraudulent claims.

40. It was further part of the scheme and artifice to defraud that just as they had done at AE Wellness, McKay paid illegal kickbacks for leads or doctors' orders that marketing

companies sent to MC Medical. The amount McKay and MC Medical paid for a lead or order varied depending on the type of brace.

41.     From June 5, 2018 to March 21, 2019, McKay submitted, and caused MC Medical to submit, false and fraudulent reimbursement claims to Medicare, totaling $1,831,075, and reimbursement claims to Tricare, totaling $15,540. At the time the false and fraudulent claims were submitted, McKay knew that MC Medical had paid illegal kickbacks for the referrals, knew Medicare would not pay for items or services obtained by illegal kickbacks, and also knew Medicare would not pay for items or services which had not been determined to be medically necessary by a doctor or an authorized health care professional.

**Integrity Medical Supply**

42.     It was further part of the scheme and artifice to defraud that on or about October 4, 2017, with McCoy's assistance, the Defendant incorporated Integrity Medical Supply ("Integrity Medical"), a DME company in Cape Girardeau, Missouri. This was approximately three months after AE Wellness was suspended by Medicare because of allegations of fraud. McCoy gave the Defendant $10,000 to $12,000 to help him start Integrity Medical. The Defendant and McCoy agreed that McCoy would be a "silent partner" and they would split the profits of Integrity Medical "50/50." The Defendant and McCoy further agreed that the Defendant would pay McCoy $75,000 to $80,000 in "consulting" fees.

43.     It was further part of the scheme and artifice to defraud that on or about November 13, 2017, with McKay's assistance, the Defendant completed a Medicare provider enrollment application for Integrity Medical. In the application, the Defendant identified himself

12

as the owner, manager, and compliance officer for Integrity Medical Supply, but intentionally excluded information about McCoy, although he and McCoy were partners in Integrity Medical.

44. It was further part of the scheme and artifice to defraud that the Defendant and McCoy continued the practice of paying illegal kickbacks for leads from marketing companies, just as they had done at AE Wellness. The amount the Defendant and McCoy paid for a lead varied depending on the type of brace.

45. It was further part of the scheme and artifice to defraud that from on or about March 8, 2018 to on or about March 13, 2019, the Defendant submitted, and caused Integrity Medical to submit, false and fraudulent reimbursement claims to Medicare, totaling $6,027,173 and reimbursement claims to Tricare, totaling $145,614. At the time the claims were submitted, the Defendant knew that Integrity Medical had paid illegal kickbacks for referrals, knew Medicare would not pay for items or services obtained by illegal kickbacks, and also knew Medicare would not pay for items or services which had not been determined to be medically necessary by a doctor or an authorized healthcare professional.

**Radiance Health Group**

46. It was further part of the scheme and artifice to defraud that on or about January 9, 2018, the Defendant incorporated Radiance Health Group ("Radiance"), a DME company in Cape Girardeau, Missouri. In December 20, 2018, Radiance became a Medicare provider, with the Defendant as the owner, director, and manager.

47. In 2019, the Defendant submitted, and caused Radiance to submit, false and fraudulent reimbursement claims to Medicare, totaling $922,562. At the time the claims were submitted, the Defendant knew that Radiance had paid illegal kickbacks for referrals, knew

13

Medicare would not pay for items or services obtained by illegal kickbacks, and also knew Medicare would not pay for items or services which had not been determined to be medically necessary by a doctor or an authorized healthcare professional.

**McKay Management Co.**

48. It was further part of the scheme and artifice to defraud that in or about June 2018, the Defendant, McKay, and R. F. attended a marketing meeting in Memphis, TN to discuss how their businesses would work together. At the meeting, R.F. proposed that R&L provide marketing services to the DME companies, provide leads, and order and pay for the braces, which would permit the DME companies to fill orders for braces without any upfront out-of-pocket costs. The DME companies would then submit reimbursement claims to Medicare and other insurers and pay R&L after receiving the reimbursement payments. The DME companies would pay R&L for each lead received from R&L, pay for the braces purchased by R&L, and split the profits with R&L. The DME companies would receive 15% of the profits and R.F. would receive 85% of the profits.

49. It was further part of the scheme and artifice to defraud that the Defendant accepted R.F.'s offer. According to the agreement with R.F., the Defendant received 15% of the profits of Integrity Medical and per his earlier agreement with McCoy, the Defendant gave McCoy 7.5% of the profits.

50. McKay did not accept French's profit-sharing offer. Instead, McKay and R.F. agreed that she would manage the DME companies, including those companies owned by the Defendant, which were paying R&L for leads. To perform this management function, in or about July 2018, McKay opened McKay Management Co. ("MMC").

14

51. It was further part of the scheme and artifice to defraud that McKay, as directed by R.F., charged the DME companies $250 for each lead or patient referred to the DME companies that she managed. At various times, McKay simultaneously managed: (a) Integrity Medical, owned by the Defendant; (b) Radiance Health Group, also owned by the Defendant; (c) MC Medical, owned by McKay; (d) Cherry Medical Supply located in Chattanooga, TN and owned by Curtis French; (e) Paradise Medical Solutions located in Miami Gardens, FL and owned by Lateese Ford; (f) Helpful Home located in Miami Gardens, FL and owned by Terrance French and Lateese Ford; (g) Perfect Motion located in Holiday, FL and owned by Terrance French; (h) Embrace of Clearwater located in Clearwater, FL, and owned by Lateese Ford; (i) M&M Medical located in Conyers, GA and owned by Marcus Moon; and (j) JLynn Medical Supply located in Atlanta, GA and owned by Lateese Ford.

52. It was further part of the scheme and artifice to defraud that McKay assisted R.F. in acquiring and setting up new DME companies, in which French's ownership interest was concealed. McKay knew the reason French acquired multiple DME companies was to "stay under the radar" of Medicare, which was more likely to scrutinize and audit a company that submitted large numbers of claims for orthotic braces.

53. McKay's responsibilities as the manager of these DME companies included handling licensure for the DME companies, completing Medicare enrollment applications for the companies, instructing the office staff at the DME companies how to handle calls from patients, and creating spreadsheets and other documents reflecting the purchase and sale of orthotic braces and reimbursements for the DME. McKay visited each of the DME companies once every three months and was paid $6,500 per month for each DME company that she managed.

54. It was part of the scheme and artifice that at the end of the month, McKay calculated the total reimbursements received by each DME company and then calculated the 85/15 profit split. For example, McKay determined that in August 2018, Integrity Medical received $213,124.77 in reimbursements for orthotic braces provided to 309 patients. From this reimbursement amount, the Defendant paid R.F. and R&L $77,250, or $250 for each of the 309 patients R&L had referred to Integrity Medical, and paid R.F. an additional $55,797.85 as his 85% share of Integrity Medical's profit for the month. The Defendant received $9,846.68 or 15% of Integrity Medical's profit of $65,644.53 for August 2018.

55. The Defendant knew the DME companies, including those that he, McKay, and McCoy owned and operated, submitted claims for orthotic braces when no physician or qualified health care professional had determined the patients' need for the braces. As an example, the Defendant knew some of the DME companies that McKay managed submitted reimbursement claims for knee braces. McKay and R.F. knew that certain tests had to be performed on the knees to determine the medical necessity for knee braces and that the telemedicine doctors signing the orders could not perform the required tests by phone.

**Execution of the Fraud Scheme**

56. On or about dates indicated below, in the Eastern District of Missouri and elsewhere,

**JACKSON PRESTON SIPLES III,**

the Defendant herein, knowingly and willfully executed and attempted to execute, the above described scheme and artifice to defraud Medicare, Tricare, and Missouri Medicaid, which are health care benefit programs, in connection with the delivery and payment for health care

16

benefits, items, and services, that is, the Defendant submitted and caused to be submitted false and fraudulent reimbursement claims for orthotic braces based on orders, which telemedicine doctors signed without determining medical necessity in exchange for illegal kickbacks and the Defendant obtained the orders by paying illegal kickbacks to marketing companies and individuals for referring the orders to Integrity Medical Supply and Radiance Health Group.

| Count | Date of Service | Patient | DME Company | Insurer |
|---|---|---|---|---|
| 1 | 08/03/2018 | W.R. | Integrity Medical Supply | Medicare |
| 2 | 09/21/2018 | P.B. | Integrity Medical Supply | Medicare |
| 3 | 10/15/2018 | A.L. | Integrity Medical Supply | Medicare |
| 4 | 03/21/2019 | R.K. | Radiance Health Group | Medicare |
| 5 | 03/25/2019 | E.B. | Radiance Health Group | Medicare |
| 6 | 09/21/2018 | R.W. | Integrity Medical Supply | Tricare |

All in violation of Title 18, United States Code, Sections 1347(a)(l) and 2.

## Counts 7-8
## False Statements Concerning Health Care Matters
## 18 U.S.C. §§ 1035(a)(2) and 2

57. Paragraphs 1 to 23 and 25 to 55 are incorporated by reference as if fully set out herein.

58. On or about the dates listed below, in the Eastern District of Missouri,

**JACKSON PRESTON SIPLES III,**

the Defendant herein, in a matter involving a health care benefit program, knowingly and willfully made and used a materially false writing and document knowing the same to contain materially false, fictitious, and fraudulent statements and entries, in connection with the delivery of and payment for health care benefits, items, and services, that is, the Defendant knowingly and willfully submitted, or caused to submitted, to the Medicare Program reimbursement claims

17

for orthotic braces, which claims falsely represented that the doctor listed on the order had determined the patients needed orthotic braces.

| Count | Date of Service | Patient | DME Company | Insurer |
|---|---|---|---|---|
| 7 | 09/21/18 | C.A. | Integrity Medical Supply | Medicare |
| 8 | 11/29/18 | B.A. | Integrity Medical Supply | Medicare |

All in violation of Title 42, United States Code, Section 1035(a)(2) and Title 18, United States Code, Section 2.

**Counts 9-15**
**Illegal Kickbacks for Referrals**
**42 U.S.C. § 1320a-7b(b)(2)(A) and 18 U.S.C. § 2**

59. Paragraphs 1 to 22 and 25 to 55 are incorporated by reference as if fully set out herein.

60. On or about the dates indicated below, in the Eastern District of Missouri,

**JACKSON PRESTON SIPLES III,**

the Defendant herein, did knowingly and willfully offer and pay remuneration, (including a kickback, bribe, and rebate) directly and indirectly, overtly and covertly, in cash and in kind, to induce R&L Marketing to refer individuals for the furnishing and arranging for the furnishing of items and services, for which payment may be made in whole or in part under a federal program, that is, the Defendant caused Integrity Medical Supply to pay R&L Marketing for orders for orthotic braces that R&L Marketing sent or caused to be sent to Integrity Medical Supply.

| Count | Date of Kickback Payment | Amount of Kickback Payment | Paid to | Payor |
|---|---|---|---|---|
| 9 | 01/04/2018 | $7,000 | R&L Marketing | Integrity Medical |
| 10 | 03/20/2018 | $7,500 | R&L Marketing | Integrity Medical |
| 11 | 09/06/2018 | $170,000 | R&L Marketing | Integrity Medical |
| 12 | 09/28/2018 | $225,000 | R&L Marketing | Integrity Medical |
| 13 | 10/26/2018 | $194,000 | R&L Marketing | Integrity Medical |
| 14 | 11/08/2018 | $170,000 | R&L Marketing | Integrity Medical |
| 15 | 11/16/2018 | $110,000 | R&L Marketing | Integrity Medical |

All in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(A) and Title 18, United States Code, Section 2.

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1. Pursuant to Title 18, United States Code, Section 982(a)(7), upon conviction of an offense in violation of Title 42, United States Code, Section 1320a-7b or Title 18, United States Code, Sections 1035 and 1347, as set forth in Counts 1 to 15, the Defendant shall forfeit to the United States of America any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense. Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense.

2. Specific property subject to forfeiture includes:

   a) $23,881.00 in funds from Bank Account #0087767678 in the name of Integrity Medical Supply, LLC at Regions Bank, O'Fallon, MO

   b) $178,964.25 in funds from Bank Account #8015831091 in the name of Integrity Medical Supply, LLC at Renasant Bank at Tupelo, MS

   c) $6,219.62 in funds from Bank Account #027022-5591 in the name of Ava Ware at Regions Bank, O'Fallon, MO

    d) $40,914.83 in funds from Bank Account #019191-3209 in the name of Jackson Siples at Regions Bank, O'Fallon, MO

3. If any of the property described above, as a result of any act or omission of the Defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to , or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

                                                                A TRUE BILL.

                                                                FOREPERSON

SAYLER A. FLEMING  
United States Attorney

DOROTHY L. McMURTRY, #37727MO  
Assistant United States Attorney